Will the clerk please call the next case. 2-17-01-15 Priscilla Kelly vs. Bill Gleeson. Good morning, Your Honors. My name is Michelle Horrell and I'm here today on behalf of Priscilla Kelly. And this is the case of the respondent trying to get a second bite at the apple regarding an 8-A open medical issue. The standard of review in this case is de novo, as I believe we have an issue of law before us today. The purpose of trial in this case in 2005 was for the purpose of obtaining open medical. The workers' comp'n is a remedial measure and the evidence is to be construed in the light most favorable to the injured worker. The commission erred in the 2016 decision as a matter of law when it failed to find the respondent's responsibility to pay for petitioner's ongoing medical care for her neck and left shoulder was established in the 2007 decision. Pursuant to Health at Home vs. the commission, the court's unreversed decision on an issue that has been litigated and decided settles the question for all subsequent stages of action. In this case, in 2007, the commission determined that the petitioner's continued reliance upon pain medication prescribed by Dr. Chanthagata is causally related to her injury. Let me see if I can parse this out, Ms. Poore. You've got two arguments or two bases for attacking the decision. You're arguing under the law of the case the commission was bound. So why don't we take that one first. The award of medical benefits, of course, originally became the law of the case. However, as I understand, after the May 2005 arbitration hearing, Dr. is it pronounced Chanthagata? It's Chanthagata, but he also goes by Dr. Das, so whatever's easier. Leslie would do his further treatment of the claimant because, according to him, she violated his treatment protocol by paying prescriptions to another physician. So the argument on your side is the commission only authorized continued treatment with that doctor. The effect of the withdrawal from the claimant's case becomes the issue. So the claimant then treated with other medical providers. So why is that the law of the case when that issue, the further medical treatment by the other providers, was never litigated? Because the issue also is when they also stated in the 2007 decision the petitioner is entitled to continue this treatment and responding is liable for four responsible and necessary costs. It doesn't specifically say that she can only treat with Dr. Chanthagata and the treatment she was getting from Dr. Chanthagata at the time. Doesn't the number of physicians rule in the statute control? I mean, if she exceeds her authorized number of physicians, then the statute would suggest that the employer is not responsible for those bills. So now you're back to the question of whether because since Chanthagata or whatever the person's name is refused to treat her because she refused to comply with instructions is the same thing as what went on in Lantner when the doctor retired and couldn't treat anymore. I mean, that's what the issue is. I mean, did she exceed or didn't she? And I don't believe that she did exceed her choice of physicians. Number one, the respondent did not raise the issue with regard to chain of referral in the original hearing, so I believe that that issue is waived. But secondly, I have several alternative arguments. And one is that Dr. Chanel cannot be petitioner's second choice of physician pursuant to the law of the case. In 2007, the commission indicated that Dr. Chanthagata was within the respondent's chain of referral. Dr. Chanel is the doctor who referred the petitioner to Dr. Chanthagata. For Dr. Chanthagata to be within the respondent's chain of referral, then logically Dr. Chanel also had to be within the doctor, within the respondent's chain of referral. Well, why does it have to be within the chain of referral as opposed to within the number of physicians that are permitted? They don't all have to be within the chain of referral. But Dr. Chanthagata can't be within the chain of referral if Dr. Chanel wasn't within the respondent's chain of referral. Why not if he wasn't the third or fourth? Because he was one of four doctors that the respondent had her examined by, was Dr. Chanel. Do you think that having someone examined for an IME and that person then refers is part of a chain of referral? An IME physician doesn't treat anybody. I think that at the time that this case was decided in 2007, that would have been the time to take that issue up if they had an issue with that decision. I believe that becomes the law of the case. And I think that they're bound by that being the law of the case. It wasn't appealed beyond the industrial commission's decision that the respondent paid the award and they were supposed to be paying for the open medical. So I think that they waived that issue pursuant to Carter when they failed to raise the issue on appeal when it was in front of the commission in 2007. Let me ask you this, and maybe this is being very technical, but this is a technical issue. The commission inclusion Dr. Chanel Pant's new choice of physicians is contrary to the law. In order for the law of the case to actually apply the issue must have been litigated and decided, correct? Litigated and decided. As I understand it, the issue of the statutory chain of referral was not before the arbitrator or the commission in the first case. So I'm struggling to see how it was litigated. It becomes the law of the case, though, doesn't it, at the point that you have a final decision that hasn't been appealed? Well, if it wasn't decided, if it wasn't decided in the prior case, how can it be the law of the case? It was actually in the conclusion section of the arbitrator's decision, and that was fully adopted. The only thing that they changed at the commission in 2007 was they reduced her permanency award from 45 percent of a person to 35 percent of the person. What did the conclusion of the arbitrator state, if you can recall exactly? It stated that... It stated specifically that Dr. Chintagata was within respondent's chain of referral, and it also stated that the respondent had not raised chain of referral as an issue. But the arbitrator said there was no objection. But they specifically found that that was in respondent's chain of referral, and the time to actually raise that issue would have been at the time that the case was in front of the industrial commission in 2007. Well, we get into the issue of what does it mean by litigated and decided. I see your interpretation, but they can make an argument that since nobody, it was unchallenged, it was not litigated or decided by anybody, because there was simply no objection, does that tantamount under the case law to being litigated and decided? You say yes, I don't know if the case law says that. That's a conclusion that actually was in the conclusion section of the arbitrator's decision. It was not appealed in front of the commission in 2007, so that is a conclusion that stands as a matter of the law of the case, I believe. So what exactly was that conclusion stated? The conclusion was that Dr. Centegatto was within the respondent's chain of referral. Okay. So you're reading back, but therefore that issue had been raised and decided. That is an issue that I believe that the arbitrator had made as part of her conclusion, and that part of the arbitrator's decision was actually affirmed and adopted in the 2007 decision. Okay, but you're arguing, you know, that we're talking just analyzing litigated and decided. If litigated, can it be sua sponte by the fact finder? Is that litigation? Isn't it a final decision? Isn't that really what we're saying? Isn't it something that becomes the law of the case? Doesn't it become the law of the case when it's written as part of the arbitrator's conclusion and that conclusion is not appealed? And that it's affirmed and adopted by the commission in 2007? Isn't the commission in 2015, aren't they, or 16, aren't they required to be bound by the law of their own decision that was present in 2007? Well, are they? I guess the problem would be very blunt. I don't see where the issue of the statutory chain of referrals was even before the arbitrator at all. The arbitrator makes a note that it was unchallenged. But she had de novo jurisdiction so she could make decisions on any issue that came before her, correct? And so did the commission. But the arbitrator's decision is irrelevant. It's the commission's decision. It could or could not become the law of the case, not the arbitrator's decision. If the commission adopts it and then it is appealed to us and it's not raised, that may be the law of the case. But it's not because of the arbitrator's decision. It's because of the commission's decision. That was my argument as well, that the commission actually affirmed and adopted the arbitrator's decision in full, with the exception that they changed her permanency award. What do we do with the evidence in this case that says there should have been no 19-H because whatever injury she had wasn't related to the underlying accident? We actually waived the 19-H section and we didn't bring that up on appeal. So my issue at this point is strictly with regard to the open medical, the chain of referral, and the award of the bills and the penalties. With regard to penalties, is there any evidence in the record that the respondent ever got any bills? There is, actually, Your Honor. Because my notes indicate that there's nothing in our record to show what bills were owed and to whom. If you look at page C2584 of the record, it actually contains an e-mail that was sent to a respondent with bills that were present. As of February 3rd of 2010, there is other correspondence that didn't get included in the record as well. In your brief, do you refer to a group exhibit that had more than 100 pages? It's group exhibit G, yes. It's an equitable exhibit. Did you specifically develop or point out which particular bills out of all of those was unpaid? How would we know that? The medical bill exhibit comes with this sheet which shows actually what bills are, which providers there are, the dates of service, and the amount billed that we're claiming is unpaid. The first part of the medical bill exhibit, group G, lays that out and explains what our argument is as far as what's unpaid. And when we send the bills to respondent, we send bills that are unpaid. An alternative argument with regards to the chain of referral is that the record in both cases show that the petitioner had gone to the emergency room at Mercy. The store manager, Jim, had referred the petitioner to Dr. Lewis. Dr. Lewis then referred her to four different doctors, Dr. Glessner, Dr. Krieger, her Wooded Rehabilitation Medicine Clinic, which is also Mary and Joy, Dr. Meehan, and Dr. Meehan. Dr. Mazur, and Dr. Witt. The respondent had her examined by four different doctors, Dr. Shea at Loyola, Dr. Chenelle, who was then at Loyola, Dr. Conowitz, and Dr. Candido. Dr. Chenelle then referred her to Dr. Dichentegada, also known as Dr. Das. The petitioner's first choice of doctor is Dr. Schiffman, who had referred her to Dr. Kazin. And her second choice of physician was Dr. Branshaw, who had referred her to Dr. Oken at Mary and Joy. Our third alternative is that the petitioner treated with Dr. Krieger at the Rehabilitation Medicine Clinic prior to the first hearing in 2005. The Rehabilitation Medicine Clinic is also known as Mary and Joy Medical Center. And that would cause her going back to Mary and Joy to be within the chain of referral. Can we go back to Dr. Chenelle for a minute? I want to hear your response. The commission conceded that claimant was initially sent to Dr. Chenelle by respondent, correct? Correct. However, then the commission reasoned that the respondent's referral was for a Section 12 examination, not for any treatment. And the claimant thereafter chosen her own to treat with Dr. Chenelle. I don't see you addressing in the brief the commission's reasoning. Why was it not a reasonable conclusion? Was she sent there initially for an examination under Section 12? She was sent there initially for an examination under Section 12. And actually her rehab nurse had indicated that she felt that she should have the surgery at Dr. Chenelle as well. She did not have a good result after the first surgery, and they were hoping that they could get her better. But if she chooses Chenelle on her own, how did the commission go wrong on making that determination? He was actually selected by the insurance company. He was the insurance company's choice of physician. Yes. But then she followed up with him on her own. Actually, I believe the rehab nurse made all of the appointments, and she scheduled everything for the petitioner. So everything was scheduled for and arranged for by the respondent. What effect was apparently Dr. Oken testified that Dr. Krieger did not refer the claimant to him? What are we supposed to do with that? Do you think I can't directly refer her to Dr. Oken? Your theory is merely because they were both at Marion Joy that they're the same treater? My theory is that if you see a doctor within a specific clinic, that going to see a different doctor within the same clinic would be the same choice of physician. Oken evidently testified that he and Krieger serve in separate offices. They don't share the same records or patients, and Krieger did not refer the claimant to him. The fact that they're in the same building? He actually testified that they were partners, that they both have an interest in Marion Joy. Marion Joy is also known as Rehabilitation Medical Clinic. So is Marion Joy the treater? It's the same business. Is Marion Joy the treater? Do they bill separately? They don't bill separately. Their bills actually indicate that it's Rehabilitation Medicine Clinic, also known as Marion Joy. And I have specific sites to the record that can show you that as well. So your theory is that this corporation, for whatever its business legal form is, is actually the treater? I have like four or five different theories. But my theory is that if you've been to a facility to have treatments and you go back to the same facility, that you're still within the same choice of physician. That is the argument on this particular theory. But I think that we also have the issue where Dr. Chinthagata has sent the letter to Dr. Branshaw directing him to get Ms. Kelly into another pain program immediately. So Dr. Chinthagata's letter to Dr. Branshaw could be a referral to Dr. Branshaw, and Dr. Branshaw's referral to Dr. Oken would keep her within the chain as well. In the Currier case, this court determined that the physician's refusal to render medical care compelled her to seek treatment from another physician. So when she went to that additional physician, that was not considered to be a choice. But in that particular case, I believe, the refusal to, for future medical, was not because of something the claimant or the injured party did. It was because the doctor wasn't going to practice in that area anymore. This is a little bit different. He refused to treat her for a reason. He refused to treat her because she was too heavy. I believe that's what the issue was in Currier. Wasn't it a little more than that? That's my recollection from reading the case, was that the petitioner was too heavy and so he wouldn't treat her. And he wouldn't refer her to anyone else. Here I believe that Dr. Chinthagata said that the treatment that she needed to receive was imperative and that the law of the case, even from Conowitz, who was Respondent's IME physician, was that the petitioner could not be taken off of her medication without guided transition and replacement medication. And so we believe that she's entitled to ongoing pain treatment. Additionally, there's nothing in the act that prevents that. Can I ask you to back up a minute? Sure. You said he refused to treat because she was too heavy? That was my reference. My notes indicate that he refused to treat her because she was getting narcotics from another doctor. I was referring to the Currier case. Oh, I was referring to our case. Okay. Why did he stop treating her? She was getting drugs from another doctor, narcotics? There was apparently a contract, there's a narcotics contract, and she said she didn't remember signing anything like that. This is right about the time I think that the pharmaceutical industry actually put everything on computers so they could check databases to make sure who was getting what medication, and she got caught up in that. The medication that she's receiving before and after, when you look and see the treatment that she had received in 2005 from Dr. Chintagata and what she received in 2005 from Dr. Oken was essentially the same treatment with the narcotics, analgesics, and the injections. I do think that the Currier case actually is another method of maintaining the... Was there some type of a narcotic contract that was involved in this case that she would not... We were never presented with a copy of the narcotics contract. Was there testimony of it? That that was the reason? I believe that there is testimony. There's definitely something that was mentioned in the position of Dr. Oken. We discussed it at that time. Well, Dr. Chintagata's position, I mean, that's documented why he refused to continue the treatment with varying prescription narcotics. Correct. That's not documented. It's just a theory. Isn't that in their evidence that that was his reasoning? That is actually in the letter that he had sent to Dr. Branshaw. All right. So it's not a theory. That's what he said. Correct? As to why he stopped treating her, correct? That's the reason that he stopped treating her, yes. I'm just saying it's my theory that at the point that he contacted Dr. Branshaw and told Dr. Branshaw to refer her to another pain clinic and make sure that it's done within 30 days, that that potentially could be a referral from Dr. Chintagata to Dr. Branshaw and then from Dr. Branshaw to Dr. Oken. I don't think we have to get there, though, because I think that she has open medical pursuant to the 2007 workers' compensation decision pursuant to the law. So, in other words, she could go to as many doctors as she wanted, whether they're in chain of referral or not under your theory because she has open medical. Is that your theory? She has open medical. She's treated for the same conditions. That's my question. You're not listening to my question. Okay. Your argument seems to be that because she has open medical, she can go to as many doctors as she wants to. There's no referral required. Either you make it under the chain of referral or you lose it. And I do think she makes it under the chain of referral. That was actually my second argument. Yeah, but this first argument that because she has open medical, she can go wherever she wants, there's no authority for that. And it certainly isn't law of the case. If she has open medical under the original decisions and she stays within her chain of referral, they've got to pay for it. Right. But if she goes outside their chain of referral, the statute says, they don't have to pay for it. But I believe that she did stay within her chain of referral. I can understand that argument. I just couldn't understand the first one. Okay. You'll have time in reply. Okay. Thank you. Okay. Thank you. Counselor, you may respond. Your Honor, counsel, may it please the Court. My name is Joseph Swig.  The decision from the commission following the initial hearing clearly states, and the order states, that the employer is liable for ongoing treatment with Dr. Chimpagala. The conclusion that counsel referred to in that decision by the arbitrator that was adopted by the commission stated that they were weighing the evidence between Dr. Chimpagala and the evaluating doctors, and they noted that Dr. Chimpagala came to see a claimant through Dr. Chanel. So the issue in terms of whether or not that referral had to do with weighing the evidence as far as ordering the bills, the treatment from Dr. Chimpagala, did not have to do with addressing the two doctors. Specifically, what the commission said was, because or since the claimant chose to accept the treatment from Dr. Chimpagala, then she is entitled to that ongoing treatment, and then, you know, when they weighed all the other factors. So that was the law of the case as far as that issue is concerned. The issue and the circumstances changed dramatically two months later when Dr. Chimpagala disrupted from her care because she found out she was violating the drug contract. The evidence of the drug contract comes from Dr. Chimpagala. He refers to it in his letter. So it's a completely different issue because we have different treatment from different providers. You're saying that is a central issue here. Her position seems to be, well, since they ordered this ongoing treatment, even though it was Chimpagala, it should apply to anybody, irrespective. You're saying that's not the law of the case. Correct. It's not the law of the case. And it's not, especially in this particular circumstance when what we have is, there is a break between Dr. Chimpagala and Dr. Hogan. And we know that because Dr. Hogan testified. His first statement was, in his statement in his initial evaluation in September of 2005, was that I need the records from the prior treatment. Dr. Chimpagala's note when he disrupted from care stated that I will provide records to anyone that needs them. Dr. Hogan confirmed that he, in fact, never obtained those records. And so there is a complete break between the treatment Dr. Chimpagala provided and the treatment Dr. Hogan provided. So if I'm to understand this maze, Dr. Chimpagala you say is okay, that's within the chain? Correct. Okay. And that's the second doctor, correct? Well, no, technically I think that Dr. Chimpagala was likely outside of the chain of referrals because Dr. Chenelle, the claimant just testified that, you know, she went to Dr. Chenelle as a referral for an IME. But then her own testimony was I chose to go see Dr. Chenelle afterwards. That was her decision. So she chose Dr. Chenelle. And on what position was that, one or two? Well, I believe that that was actually the third position. The what? Third? Third, because she had seen Dr. Lewis, who counsel referred to as a co-choice of physician. She also testified in the commission reference to the decision that she had seen Dr. Shipman. And she had also seen Dr. Chenelle. And so I think that was, you know, at that point I believe that was the third choice of physician. In which event you're not liable for that? Well, you know, at that point we weren't raising the issue in terms of choice of physician at the initial hearing because that wasn't what was particularly germane at that point. Well, let me ask you a question. Were you ordered to pay Chinzigano's bills in the first hearing? Chinzigano's bills, his order, the order stated that we were responsible for the treatment from Dr. Chinzigano. So you waived the question of whether it was outside of the referral? You could have raised that you didn't. You can't turn around and raise it again in the second case. For Dr. Chinzigano. For Chinzigano. I'm not talking about Dr. Chinzigano. Because she stopped seeing Dr. Chinzigano two months after. Well, I understand that. But that didn't seem to be your response to Justice Holder's. You seemed to be suggesting that Chinzigano was outside the chain of referral. I believe he was outside the chain of referral. But you waived that issue in the first case. But I don't think that's relevant for necessary germane to the issues in this case because Dr. Chinzigano's treatment ended two months after. What we're really talking about is the best amount of treatment from Dr. Hogan in the other providers. And so the question becomes, if you can't claim it can link Chinzigano to the physicians afterwards, then you are on a hook, right? Well, yeah, I don't know if it's... Well, I mean, because then it would be within the chain, wouldn't it? Assuming you waived in the first thing the Chinzigano, however you pronounce it. And so anything emanating from Chinzigano or Chinzigana would be within the chain, wouldn't it? You know, I mean, potentially it would be. Potentially, yeah. I'm not going to ask you to concede everything. But that's basically, if I'm trying to understand this, that seems to be the claimant's position, right? Yeah, I don't know. Maybe I misunderstood exactly how she was stating it, but I don't know that it was exactly put forth in those exact terms. But regardless, you know, that's potentially an issue. But in this case, she was seeing Dr. Branshaw without Dr. Chinzigano knowing it. Dr. Branshaw clearly is the one that recommended or referred her to Dr. Hogan. Dr. Chinzigano, in fact, within his letter that counsel referenced in terms of needing ongoing treatment, specified five specific hospitals that he would recommend. That's not where she ended up. Let's bring that down. Doesn't the record show that the claimant requested a referral from Dr. Branshaw to Dr. Hogan prior to the day Chinzigano withdrew from the case? Correct. So he was still her physician, and she requested this referral. Dr. Branshaw was a physician that was not part of the original workers' county claimant, and she requested a referral from Dr. Branshaw. Even though Chinzigano was still in the picture at the time. Correct. Okay. The other issue, Your Honor, is I mean, still, it's a unanimous way of the evidence question. The commission states that they reviewed the entire record in this case, including the record made at the original proceedings. The record states it was a decision. Yeah. The presumption is that they reviewed the record and supported the record without the remaining record being attached to the subsequent proceedings. I'd like to address the issue with regard to Petitioner's Exhibit G and the outstanding medical bills. Because in her reply brief, counsel refers to the argument we're making in this case as a disingenuous argument. And I want to be clear that this is not a technicality or an effort to simply say, gosh, on this case. This is an issue that has to do with a very significant amount of treatment, amount of medical bills, with overlapping conditions in the same providers who those bills were provided with. As far as us receiving the medical bills, counsel referred to an e-mail that was sent with regard to some of the bills that were supposed to be provided to us. That was an e-mail from counsel referencing our Exhibit No. 5 in the original proceedings in terms of attempting to demonstrate that Marion Joy and Rehabilitation Center were the same place. And she attached some of the bills purportedly containing the exhibit to show that this was, in fact, the same place, which we dispute, of course. But that was the purpose. That's why some of the bills were attached. They outright don't stretch all of the bills. It's not any sort of explanation as to the bills or records to support the bills that were attached. In that exhibit, the bills that were attached, a large number of those bills, half of the page was blocked out so you couldn't see the bills. It's clear that in December of 2009, five years, four years after the initial proceedings, we didn't have these medical bills. In fact, counsel's e-mail to me in December of 2009 states apparently she's still receiving treatment. Counsel was unaware of the ongoing treatment four years later. At that point, we were asking for copies of the medical bills because we weren't receiving the bills. Those bills were being sent to the husband's group of insurance people, presumably because it came through Dr. Branshaw, the treatment he was directing, and I think he was submitting those to the husband's care. But in 2010, we answered the bills. In 2013, January 2013, we sent a letter explaining that for a number of years we had been requesting the medical bills. We had not received the medical bills. I confirmed that my client has not received the medical bills. The first time we received the medical bills was when the case finally proceeded to hearing. And the reason all that's particularly relevant in this case is because, excuse me, is because the circumstances now have changed in terms of the treatment that she was receiving when she got distressed from Dr. Chimpagala. But in October of 2019, because it's a very significant back injury that resulted in multiple surgeries, that resulted in many treatments, and Dr. Oka and Dr. Branshaw themselves confirmed they were providing treatment for those conditions. So we've got a very large number of medical bills that are produced without sufficient foundation, and somehow or other the respondent is asked to pay these bills when there's no foundational basis to determine what exactly the bills are. Well, did the commission ever address the select intervening accident? Well, they addressed it in terms of, with regard to the bills, they did reference that Dr. Branshaw and Dr. Oka were providing treatment for the back and the neck. That was part of the basis for them stating that this Exhibit G is not a reliable exhibit. By the way, you seem to be saying, in summary, you took the initiative to try and get these five dollars that those were to have them paid, and you're saying that obviously they were not worth coming there when there was no improper purpose or delay. Is that the estimate? Well, as far as penalties is concerned, the bigger point is there's no foundational basis for these bills to establish that these bills, in fact, are payable in reality. It's just a group exhibit that went in your set. Exactly. Right. Nothing was highlighted, nothing was called to anybody's attention? Correct. I think it was explained. Exactly. So are there other further questions? Nope. Thank you, Your Honor. Thank you, Counsel. Counsel may reply. How was Branshaw within the chain of referral? How'd she get to Branshaw? Branshaw is her primary care physician that she was treating for for other conditions at the time that she was also so she had a prescription for estrus and things like that that are not related to her work camp claim that she treated for him with that. So how was he within her chain of referrals? I thought Dr. Lewis was the first doctor she saw. Well, Dr. Lewis is the doctor that the store manager referred her to. Okay. And then Dr. Lewis referred her to four additional doctors. So her first choice of physician was Dr. Branshaw. That was her first choice? Yes. With regard to the order for 2007, it actually states in Section 5, or Conclusion Number 5, on page 3 of that order for 2005, which was adopted in the 2007 decision, that petitioner is entitled to continue this treatment and respondent is liable for reasonable and necessary costs. It doesn't say that she has to receive it strictly from Dr. Chinthagata. No one says she had to get it from Chinthagata. She's got to get it from somebody within the chain of referrals. She can't exceed the two-physician rule. The question is, did she? Okay. And I believe I laid out in my brief, and I've discussed today my arguments for that. With regard to the petitioner requesting a change from Dr. Chinthagata to Dr. Oken before Dr. Branshaw, that didn't happen until Dr. Chinthagata actually contacted Dr. Oken. Dr. Chinthagata called Dr. Branshaw. That's documented in the record, and Dr. Chinthagata. And then he told them that they were going to be sending a letter out telling her that she was going to need to seek a different doctor. But Dr. Chinthagata contacted Dr. Branshaw directly, and that's why she switched. She wasn't happy with Dr. Chinthagata's treatment, and it wasn't a decision that she made on her own. Dr. Chinthagata quit her. She didn't quit him. You wouldn't give her more drug? So she didn't like it? She didn't quit him. She didn't quit going to Dr. Chinthagata until Dr. Chinthagata contacted Dr. Branshaw. Chinthagata said you violated the drug policy, the loyal drug policy. You're getting drugs from another physician. I didn't know about it, and it violates the policy, so I won't treat you anymore. That's exactly what happened. And it's at that point that she switched providers. She did not seek a referral to Maryann Joy from Dr. Branshaw until after Dr. Chinthagata discontinued his treatment with her. Wait a minute. I thought I asked the opposing counsel that. Claimant testified she was treating with Dr. Branshaw in the summer of 2005. Is that correct? Correct. And in July 2005, she and Dr. Branshaw discussed a referral to Dr. Oken. Correct? That's what you asked him. I don't believe that's what the record indicates. Dr. Chinthagata's withdrawal letter is dated August 16, 2005, well after claimant discussed the referral to Dr. Oken. Correct? There actually is a phone record in Dr. Branshaw's records from where Dr. Branshaw had received a phone call from Dr. Chinthagata, and that is when they discussed the referral to Dr. Oken. She didn't go to him prior to that. But is that in the brief? How do we know this? Is this something that we can take a representation on, or do we need it in the brief? That's my concern. I can give you a supplement with the sites, because I looked at it yesterday, because I looked at the entire record again yesterday when I was preparing for this, and I did see that note in Dr. Branshaw's notes. But it didn't make it into the brief. It's in the record. It's in the record. It didn't make it to the brief, but it's in the record. Okay. With regard to the bills not being received by the respondent, if you look at the Delmar bills in Petitioner's Exhibit Number G, you're going to see that it billed Broadspire, and it also billed Unicare, which was her husband's HMO insurance. So the bills were going to Broadspire. What they did with them when they got them, I don't honestly know. With regard to the petitioner's condition, Dr. Conowitz had examined her in 2003 for the respondent, and again in 2010 for the respondent, after she had her slip and fall, and he did conclude that the condition of her left shoulder and her neck was essentially the same as it had been. She still had issues with spasms and swelling in the left shoulder, and she still continued to have the pain in the shoulder and the neck, which was equivalent with what it had been prior to her slip and fall. Okay. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter this morning. We'll take another advisement, and a written disposition shall issue.